the  OK, the next argued case is number 18-20-87, Plastic Omnium Advanced Innovation and Research against Dungey, America and Dungey, Alabama. When you're ready, Mr. Atchis. Thank you, Your Honor. Thank you. Good morning. I am Alex Atchis of the Oblon firm, and I'm here on behalf of Plastic Omnium, the appellant in this case. May it please the court. This is an appeal from a final judgment that directly stems from an entry of summary judgment on non-infringement by a district court. In that order, there were four appealable issues from our perspective. We have been thoughtful and selective in what we have decided to bring to this court's attention, and we have selected two of the issues for this court's consideration. The first is the issue that the parties are calling the parison claims issue. In that instance, summary judgment of non-infringement was entered, and the district court concluded that the claims themselves do not cover a parison that is split inside any extrusion head slash dye equipment. In making that claim construction conclusion in the summary judgment order, the district court then went to infringement and concluded that there was none, because although, as the court saw, was undisputed that a parison is extruded by the Dong He process, and it is undisputed that that parison is cut after it is extruded, it is cut in a component called a flat dye tool. And because of the presence of that tool, the district court made the ultimate conclusion that there was no infringement. That's because it was extruded into the structure, the flat dye structure, right? Correct, Your Honor. The parison, which undisputedly has been created, was created by the- Isn't there a fact question as to whether or not the spiral mandrel creates a parison? I mean, in the briefing from your other side, they say, well, there's no parison here at all. Their view is that there's a lot of molten plastic goo in the extrusion head in Dong He, and it flows through that thing in whatever the spiral mandrel is they ignore. And it just flows down into the flat dye, and the flat dye separates it into two streams of goo. That's their view. They are re-arguing a fact question that the district court had considered and disposed of as undisputed in the summary judgment order. And if you look at the order at Appendix 20, which is at page 14 of the order, and I will quote it, the district court, in arriving at its conclusion of non-infringement, stated, quote, since for the accused product, it is undisputed that the extruded plastic parison is cut in a separate flat dye tool after it leaves Dong He's co-extrusion dye, there is no genuine issue of fact that Dong He's accused product does not literally infringe the parison claims. And the only reason there could be non-infringement under that analysis is because the cutting took place inside a structure as opposed to in the open atmosphere. That's correct, Your Honor. And the claims and the patent itself have no support for such a locational limitation. In fact- Well, the patent doesn't tell you whether or not the cutting can or cannot. It simply describes cutting, and it doesn't show it happening in a structure. That is correct. The standard patent argument is, well, because it doesn't show the structure doesn't mean it excludes it. Absolutely. And even the other side wouldn't argue with that proposition in patent law. Right. The patent does show some post-cutting processing in that there are in the figure are rollers and other mechanisms that work to handle the plastic after it's been split or cut. My understanding of it is both in what the patent does and what the Dong He device does is you have an excursion head and the molten plastic is fed into it and fed down into the bottom of that structure. And then in the patent contemplates a die, some type of a structure lying at the bottom of the extrusion head. Correct me as I go along. Tell me, stop me as I go. At or after. Okay. And at the bottom of the extrusion head there is this structure called the die and the goo passes through or around the die in some way or form so as to create a parison which begins to sort of drop out of the bottom of the extrusion head. That's correct. And the district court said, well, you don't have to extrude a complete parison that any piece of the parison as it emits from the bottom of the extrusion head is a parison. Correct. And so the patent then has a couple of cutters that bisect, split the emerging parison. That's my understanding of the patent. That's correct. And I'm gonna have to correct myself because when I said the die is at or below, I was thinking of the blades or the knife that you just mentioned. That's right. That can be at or below. You have a structure inside the extrusion head, the die, that serves to create a parison. That is correct. And your argument is the accused device likewise takes the liquid molten plastic and introduces it into an extrusion head and it comes down and there is a circular structure your expert Oswald said inside that device and in connection with it as a spiral mandrel and somehow as the goo comes in or around that structure, it like your patent emits the beginning head of a parison. Absolutely. Which drops down into the flat die, which is attached piece of equipment. And then the attached die, it's separated into two streams. Correct. And I'd like to point to two different sources to... Let me just ask one more question. Sure. It helps me out. All of this, I mean, this case was made immeasurably harder for me by the fact that the briefs on the summary judgment were so highly redacted, I couldn't tell who was talking to who. So we got the unredacted briefs. And then I got the transcript of the hearing on the summary judgment, which you all didn't give to us in full. And it was perfectly clear that the judge understood how these things were functioning. Because the judge was asked, why, what reasons, why wouldn't you have infringement? Yes. And the other side said, well, there are two reasons. One is the claim requires the die that creates the paraffin to be mounted on the structure. And if that were true, they'd win, because yours isn't mounted on. So the judge didn't accept that. The other argument was, oh, well, the paraffin can't be the liquid glue inside the structure. Those were the two answers that were given. Right. And the judge certainly didn't get to whether the paraffin is goo or not. Ultimately, he did indicate as an undisputed fact that the paraffin is created, or a paraffin is created by the extrusion head. And I get a little confused with the usage of the term goo, okay? Because I think the pen is clear as to what's extruded. And the dongy pen also is pretty clear as to what is dropped into that flat die. I'm looking at Appendix 948, the Memorandum and Opinion of the Court. And there at the bottom, for example, it says, accordingly, the court will construe the term paraffin as referring to a plastic tube. Are you with me? As referring, I'm reading page seven of the... I am with you, Your Honor. Okay. There at the bottom, it says, accordingly, the court will construe the term paraffin as referring to a plastic tube, so that's not goo, a plastic tube with a closed cross-section that is shaped by and has reached the end of a die and is split either immediately upon exiting or at some point thereafter. So the court made a specific fact, a factual finding that the split is made after the person, as a person exits the extrusion device or at some other point. Yes. Correct? That is correct. And just in your colloquy with Judge Clevenger, it seems to me that you're also noting that when the material is dropped into that flat die of the dongy device, that it's split inside the device. That is true. Not outside of the device or after it's taken out, it's done within the device. That is true. And what is occurring, and I'd like to address this from two levels or from two sources, but what is occurring in what you've described, Your Honor, is that a person has been extruded by the co-extrusion die in the dongy system, and that extruded person is then sent downstream into the flat die tool to which you refer and cut in that flat die tool. So there's a person that's been created, it has been extruded, and to extrude a person by definition and by the court's definition, you must pass plastic across a die. That is located on Appendix 20 at the top of the opinion on summary judgment. It is the first sentence that bridges from the prior page. It says, quote, an extruded person is a, quote, tubular preform with a closed cross section that has been forced through a die and is cut or split as it exits the die or at some time thereafter. So from the perspective, and I said I'm going to point to two sources, from the perspective of the summary judgment opinion, the factual question has been undisputedly resolved to be in a state at which a person has been extruded from the co-extrusion die and it is later cut. What the opinion is focusing on is not whether a person has been extruded and cut, it's where it's being cut. The district court judge was looking at the patent as though the patent had a limitation that said that the cutting blades had to be in a housing. The cutting blades, as you stated it before, can't be in extrusion die slash extrusion equipment and outside of it. The die that creates the person is different from a die that cuts the person. Those are two different components. I mean, you choose to use a couple of a knife, a couple of a knife in your patent to split, cut the person as it's dropping down, right? Yes. They choose to use a different structure to separate, but what they're separating is the same thing as the district court found as a paraffin. So the district court said, well, there's no infringement because they are cutting their person in a structure. Correct. So as if you took your patent and you drew a little, you made a, the district court was construing your patent to mean that the cutting mechanism, whatever you call it, flat die or call it knives, has to be in a housing and have two little holes at the bottom of it that allows the split paraffin to come out. Correct. And your argument is there's no such limitation in the patent? That's right. That's right. And if you turn to your blue brief. Let's go back a little bit. And let's look at that same page that I was citing to. Your Honor, sorry. Okay. I lost it. 948. 948, page seven. And this goes back into what I started out by the confusion I think we have with the word goo. And then also now with a paraffin and an extruded paraffin. Okay. So just to be clear, the court made a finding. It says there on about the middle of that page, the sentence begins with leaves the die. The anyway, it states, the court agrees with Donnie that the construction of the quote extruded paraffin quote, term should not include molten plastic or tubular preform present inside the die extrusion head. So what's inside the Donnie device is not an extruded paraffin. No, that's not. That is not true as a matter of fact and as the summary judgment order has been written. However, I would like to address what the court, the district court is addressing as you've read it because it's an important distinction and I think it is a point of confusion for sure when you consider the Markman order, the patent against the Donnie process. The confusion to me is that in the patented device, you have extruded, you have an extruded paraffin and that's what's leaving, that's the circular tube and that's not molten plastic at that point. You never have inside the Donnie device that tube. You only have molten plastic. No, no, that's not true. So if I can refer you to the figure on the 812 patent. This is what the court, what I just said is, I'm not making it up. This is a court finding. The court in the Markman order. Well, to go back to the language that Judge Green was just looking at. Yes. But what the court was agreeing with Donnie that an extruded paraffin, extruded paraffin can't be something that is inside the head. Yes, so. Well, it can't be inside the head because it hasn't been extruded. Absolutely. If you think about a faucet in your kitchen, and when you turn the faucet very briefly on, a little blob comes out of the faucet before it actually drips down. You know, that little blob of water before it actually goes plunk and falls down. Well, that little blob of water is an extruded paraffin. If you think about what it's like. And so what the court was saying is, what drops out of the bottom of the extrusion head  is the equivalent of that little bubble of water that exists at the bottom of the faucet. And it doesn't have to come all the way down in a plastic form. So long as it's just starting to come down, that constitutes a extruded paraffin. Correct, and if you turn to Appendix 76, I'll use the pattern figure. But let's go back. Is that what the court says? The court says extruded paraffin, quote, extruded paraffin, that term should not include molten plastic. So whatever extruded paraffin, whatever the extruded paraffin is, it cannot include molten plastic or a tubular preform that's present inside the die of the extrusion. And let me explain that statement. If you turn to 76 of your appendix, there's the figure from the patents that is in all the figures. And what the court was saying there is that if you refer to the component number two, that is the extrusion head in the disclosed system. At the end of that component, as disclosed in the specification, there is a die that creates a paraffin that is then cut by the blades three. The court is simply saying that a paraffin does not exist in the extrusion head number two before it has reached and passed through the die. And therefore, Plastic Omnium, if your argument is that cutting molten plastic in the extrusion head before it's passed through a die, if that is your argument, I disagree. There has to be a paraffin that's been extruded, and an extruded paraffin is something that passes through the die after it's been processed in the extrusion head. Now, the point of confusion here is if you turn to your brief, the blue one, I'll start on page 20. Councillor, all that's fine, but I just remind you that your claims require an extruded paraffin. That is true, and the district court recognized that one is- That means it cannot be molten plastic. If you turn to page 20 of your brief in 22, let me show you what is happening, what the district court has concluded, and- The diagram of the appendix? I'm sorry, the blue brief, our opening brief. Blue brief, 22? Page 20 and 22. Okay. First, starting at 20, you can see the extrusion head and the flat die tool as they're connected and exist on the factory floor. The extrusion head is the drum-like component, and the flat die tool is the- I'm sorry, Councillor, I- Page 20 of the blue brief. It's a photograph that's hard to see, but it's basically simply showing the extrusion head and the flat die. It's easier to look at the image at the bottom. It shows the extrusion head is the drum, and the flat die tool is the rectangular component. If you then turn to page 22, you will see the illustrations, three sets of illustrations that describe Donghi's flat die tool. And these are ordinary course documents. They describe how this particular component works. And if you look to the upper right, you'll see the blue and yellow image is an illustration, functionally, of how that tool works. And it states, inlet, round six layers parison. That is showing, Your Honour, that a parison has been created by that drum that I showed you in the image before, which is the co-extrusion die. And that parison is then passed into the flat die tool. Once it's passed into the flat die tool, you'll see in that series of three yellow and blue images, there's a yellow and blue image kind of at a different perspective. The blue component is illustrated, and the words tell you what it's for, cutting the parison in two halves. So that parison is then cut by that particular component in the flat die tool. The molten plastic has been converted into a parison. Correct. As a result of passing through the bottom of the co-extrusion head. Correct. And so what the court. Those facts are there, I mean, the district court said. And the only thing is that a parison can't be mere molten plastic that's inside the extrusion head. Before it. It has to be formed as a result of passing through a die. That is correct. And where the district. The judge understood that. It's just that he said, excuse me, if you're going to cut a parison, you can't do it inside of a structure. Right. You have your cutter has to be in the open air, period. And this is ultimately the classic question. The other interesting point to me was the product literature here for the Danji device refers to the device creating a parison 45 times. 45 times. As a co-extrusion die. 45 times, and the device is made by a German manufacturer that makes it off of his patent. And his patent clearly claims creating a parison. And the excuse below as to the 45 references in the product literature of the accused device, 45 references to a person is they were a mistake. Right. They have an expert who said it was a mistake. We used the wrong word 45 times. And the court didn't buy into that excuse. The court applied a different claim construction. You have this essential ground rules here. Is you have to create a parison. The parison doesn't have to be fully formed. If you look at my finger, as though my finger here is what's dropping out of the extrusion tube, it doesn't have to drop all the way down and be a fully formed parison. Everybody agree. It can just be the little nip, the drop of water coming out. Right. You have to have one of those. And then you have to slice it, you have to bisect it. And that's all you have to do. Correct. And that is done. There was a fact finding here that there's a parison created and there's a fact finding that it was bisected. But it was bisected inside a housing. It was as if we build a little box around your gut. Yes. And the district court said that's enough not to in front. That's correct. Pretty simple case. Now it's made more difficult, as I say, because you didn't give us, nobody gave us the whole briefing, A. And Angie runs around in circles and wants to deny the existence of the spiral mandrel. They want to pretend as if there's no structure at all in their device. And as Judge Marina said, as nothing's coming out of the bottom of their device except goop. And that's right. And they're arguing facts that aren't part of the summary judgment order, the state of the plastic. Even though their expert conceded that there was a parison in their device. And I'm shocked. But it seemed to me that this case is extremely simple once we get by being confused by what these terms are. The question, and so the, here's the question to me, seemed to me there is a fact question. I think the other side's gonna stand up and say, well, the judge was wrong. Or when there's a fact question as to whether or not there is a dye in the bottom of their co-extrusion head. They will likely, if you refer back to page 22 of the blue brief, point to what they refer to as a dye on the flat dye tool. The flat dye tool has a series of flaps at its exit. The flat dye tool's got a bunch of dyes in it. Correct. All a dye is is a structure that directs something from one place to another. And so the, I mean, the flat dye tool is full of dyes. Is it because it's a very sophisticated piece of equipment? Right, and our position is that's irrelevant as long as there's a dye that creates a paracin, and that paracin after it's created is cut. The pattern doesn't describe how you cut the dye. It's all that we need to show. It doesn't limit how you cut the dye. Correct. But you have to have a paracin, and the paracin has to go through a cutting dye to be split. If there are no further questions on this issue, I will turn to the pre-assembled structure issue, which is the second one that we appealed. Okay, well, let's hear from the other side, and we'll save you some rebuttal time. Okay. Thank you, Your Honors. Mr. Shumsky. Good morning, Your Honors, and may it please the Court, Eric Shumsky representing the Donkey Entities. Judge Rayna, I'd like to begin, if I can, with a question that you asked, because I think it brings together a couple of these threads and gives us the answer. The key here is when you have not just a paracin, but an extruded paracin, and the 812 patent actually defines that term. It's located in let me give you the line site here. It's in column two, and it says that an extruded paracin is understood to mean the product obtained by passing through a dye, right? So you have to have an extruded paracin. When do you have an extruded paracin? You have it when the paracin has gone through the dye. And Judge Stark understood exactly what was going on here. I come back to his opinion on infringement at Appendix 20. The district court said it's undisputed that the extruded plastic paracin, meaning that there is an extruded plastic paracin, is cut in separate flat dye tool after it leaves the coat he had, citing DI2, what is DI236? So this is an absolutely critical passage, Judge Clevenger. What is DI, my question, sir, is what is DI236? What that is is plastic omniums brief. Brief on what? It's summary judgment briefing. And so what Judge Stark is doing here is clear if you look at the sentence immediately before that one. So if you look, one, two, three, four, five, six, seven lines from the bottom of the page, Judge Stark points out that the splitting of the molten plastic must not incur, must not occur inside any of the extrusion head dye equipment. So then what he's going on to do is to accept the concession from plastic omnium. And- Okay, the inside the head dye equipment. So that is not your flat dye. What is the extrusion head dye equipment? What is it? So what he's talking about here is the asserted claims, right, he's talking about plastic omniums invention. The splitting of the molten plastic must not occur. He's talking about what the claims require. From the plastic omniums point, the extrusion head dye equipment is their structure  Yes, exactly. And this is what Judge Stark is doing. This is what's critical about what- No one's disagreeing with that, that you can't split. You have to emit first a extruded plastic paracetamide. Okay? Correct. If you split molten plastic, however you're doing it, you're not splitting a paracetamide. More precisely, you're not splitting an extruded paracetamide. No, you're not splitting anything. Yes, I agree, Judge Glavinger. A paracetamide becomes an extruded paracetamide once it's slipped out the bottom of the dye. Yes. And you agree it could be my proverbial drop of water as well as a whole tube. Yes, I mean, there was a dispute about that below, but for present purposes- I don't disagree. So any little blob that drops out after it's gone through the dye forms a paracetamide, right? Yes, and so what Judge Stark is saying here, the concession that he's accepting is one, two, three, four, five lines from the bottom toward the end, that here the plastic is, quote, cut in a separate flat dye tool. What Judge Stark is pointing out is accepting from Plastic Omnium is that contrary to the claim construction, contrary to the immediately preceding sentence that I read, the splitting is happening in the dye and therefore- Well, what about the splitting that's happening in which dye? In the accused products. In the accused products? In the flat dye. It's in the flat dye. Correct. That's where it's split. Yes, and therefore what Judge Stark is saying is you don't have an extruded paracetamide being split. Right, that's the- Wait a minute, if the extruded paracetamide, if the paracetamide is dropping down into the flat dye, and that's what he's saying. He's saying here that there is an extruded plastic paracetamide, okay, and it leaves Dongey's co-extrusion dye, it leaves your upper structure, the round thing. It leaves the extruded, it's extruded out of it, and then it's cut in your separate flat dye underneath. That's what he's saying. It is not, Judge Clevenger, if you bear with me, let me walk you through this. He is saying one thing, but the second part of what you said, I think he is not saying. So the critical conclusion here is that the cutting is happening in the flat dye tool. Right, I think we all agree about that. It's not happening in the open air. What does the patent say about where you cut, where you bisect the extruded paracetamide? Well, it simply says that it has to happen after the paracetamide has been extruded. Okay. So let me ask you this question. If the patent had said the splitting occurs in a housing, the cutting blade is enclosed in a structure, it said that, then your product would literally infringe, correct? I mean, there are other arguments that are available. Yes or no? No. Why not? If the patent had said that. My point, Judge Clevenger, is simply that- I'm answering the question. Why, if there's a fact finding that your device creates an extruded paracetamide, and that extruded paracetamide is cut after it comes out of the device that creates it. That's what he said. It's cut in your flat dye tool, in the structure. So I'm saying if the patent had simply said the extruded paracetamide, extruded from the bottom of the extrusion head, is bisected in a structure, including blades or whatever. If the patent had been written that way, your product would literally infringe. It would not for two reasons, and let me try and get both of them out. There would not be an overall ultimate conclusion of infringement because we have other non-infringement arguments, not- I'm talking the paracetamide, so stick with that. I understand, Judge Clevenger, but statements that counsel makes at the podium have a way of taking on a life of their own, and I cannot make a statement that we would be held to an infringe. That's the first point. The second- This is irrelevant to our discussion. Go ahead. Understood, Your Honor. The second point goes to what Judge Stark was talking about when he was talking about where the cutting occurs. The critical question is not whether it is- Where did he say that? Show me exactly where he's talking about where the cutting occurs. He says that it is, the first sentence that I read to you, molten plastic, the splitting of the molten plastic must not occur inside any of the head dye equipment. And it doesn't, and your device doesn't do that? Correct. Okay, so it doesn't do that, fine. The reason that that is important is not about whether it's in the open air or not. It has to do with the order of the steps that have to be performed. In the claims here, you have to extrude- Which he says your device does. Let me come back to that, Judge Clevenger, if I may just finish the thought. There are three steps. You have to extrude plastic. It has to be an extruded parison, meaning it has to go through a dye, and then it has to be cut. And that's what he says it does. The accused products do something different. The plastic comes out, then it is split, and only then is it shaped through a dye. The things happen in a different order. Well, what about the existence of the spiromandrel, which Oswald says functions to create the parison? And the critical- And that's briefed and argued, and your red brief doesn't even use the words. You run away from the spiromandrel, like it was pointed. Judge Clevenger, I want to say this as firmly as I can. We absolutely are not running away from this, and it is clear- Why didn't you address it in your briefing? But we did. We did not use- Where? We did not- You said there was no parison. Your red brief says there is no parison created. Do I have to- You know you said that in your red brief. And how can you say that in your red brief when there's a fact finding that there was a parison created? And your product literature 45 times, 45 times says that your device creates a parison, which is cut inside your flat die. That is the key, and if I may- Tell me about the product literature. Why is, if you tell the public that your device creates a parison that is then cut in a flat die, and you say it 45 times, how can that be wrong? Let me try and answer your question this way, Judge Clevenger. Tell me, what's the basis for saying it was wrong? Was it error in translation between German and English? May I answer the question, Judge Clevenger? Yes. What's going on here relates to the order in which the steps are being performed. As I was saying a moment ago, that's the first thing. And the second, and this goes to why Plastic Omniums Expert is wrong as a matter of law under the patents. Their theory is, and Judge Clevenger, this goes directly to your question, their theory is that the extruder is a die. They are one in the same thing. If you look at Appendix 240, if you look at Appendix 249, the contention is that the head itself, the extruder, is the die, and the patents are absolutely inconsistent with that. So as a starting point. Sure, but the expert, I mean, you want to throw Oswald under the bus, but Oswald testified and averred under oath that there is a structure, a spiral mandrel that lies at the bottom because where that die is is important, as you and I both know from the patent point of view. The Oswald says there is a structure in the bottom of the extrusion head of Dongi that serves to create a parison. Those are his words. So Judge Clevenger, the pages I was citing to you a moment ago about treating the extrusion head and the die as interchangeable are also from Oswald. Now, how can you reconcile those two things? Well, because he's treating them as a unitary when he says, describe to me the overall what they've got. He's not. They've got an extrusion head, co-extrusion head. It's a co-extrusion. It functions both as the head and also as the die. So there's a fact. At least isn't there, I mean, are we to throw Oswald under the bus entirely or is there a fact question? No, there is a factual answer and a leak. This is a case comes up on a summary judgment of non-infringement. So what the other side's asking for is simply further proceeding. Maybe it's further briefing, maybe a trial, maybe not. But they're saying at best here, there seems to be a confusion about how the accused device functions. There is a question about whether or not there is a die at the bottom of your co-extrusion head. And if the district court is saying, well, there's no infringement simply because the cutting in your device takes place in a housing as opposed to the open air, that didn't seem to me to be a very good reason to distinguish the patent from the accused device. And you haven't given me an answer to the open air rationale. So let me focus on what Dr. Oswald said because there is a way to reconcile the language you were quoting and the language I was quoting and then let me turn to the patents which show why Dr. Oswald is simply wrong about what the patents themselves say. Dr. Oswald didn't like what the patents require. And we see that 1926 of the appendix. He specifically conceives that the patent requires, quote, a die mounted on the extrusion head. That is to say that the die is separate from the extruder. And what was Dr. Oswald's explanation about this? This is a quote. It may just be a poor choice of words. The expert thought that the patent used the wrong words. The mounted argument is not in play. It isn't. It absolutely is in play here, Your Honor. Because the claim construction, the district court never construed the claim to require the die that creates the imperative to be mounted on the bottom of the extrusion head. So first of all, the other side conceded that that is correct at page 16 of their opening brief. And it is absolutely what the claims require. If you look at- Wait, wait, wait. That claim construction doesn't exist. We're at page 16 of their brief? Where is the concession? So at page 16, for example, the specification- I've got it open, sir. Let's have the line number. Second full paragraph, second line, which is mounted on the extrusion head. And that is the exact same language that appears in the 812 patent. Both patents in the district- I agree with you. I mean, that's the... When I was trying to figure out how Judge Stark got where he got, I said to my law clerks, he must have interpreted the claim to require the die that creates the person to be mounted on the bottom of the extrusion head. I said that, and then that would fit with vitiation. Everything would work. And then I go read his claim construction order and I read it up one side and down the other. It never says a word about mount at all. Never says a word about it. And it's not in the claim language. It's in the description of the preferred embodiment. Not the description of the preferred embodiment. This is critical, Your Honor. It's in the description of the invention, according to the invention, in both the 812 and the 921. And if I can just finish, Judge Clevenger. Once upon a time in a panel sitting with my distinguished presiding judge, Exon against Lou Brizol, I reached forward and said, I'm smart enough to interpret these claims myself, even though the district court didn't do it. And I drew a very substantial criticism from my colleague and said, that's not what appellate judges should do. So I'm not about to construe this claim to require the paracetamol-creating dye to be mounted on the bottom when the district court never did that. Send it back and ask for that claim construction. I don't mind doing that. But let me try and persuade you why you don't need to do that, Judge Clevenger. I think that what you were talking. You're gonna have a hard time because I took a frolic and detour once and I'm not a fan anymore of this court doing independent claim construction on appeal. Well, I hear you, Judge Clevenger. Let me try and persuade at least your colleagues why it's not a frolic and detour and why it's actually in here. That language, the language we've been discussing on appendix page 20 about the plastic being cut in a separate flat dye tool, implicit in that, inherent in that is Judge Stark's understanding that there is no separate dye mounted at the top or mounted at the bottom of the extrusion head. What Judge Stark is saying, and I'll put this as simply as I can as it goes back to this question about the order of operations that I was talking about before. In the accused products, you have extrusion of something, whether you wanna call it goo or whatever else, and then splitting, and only then do you have shaping through a dye. That's what Judge Stark understood and that's what he was holding here in the summary judgment order where he said that you cannot have cutting occurring in the flat dye. No, no, no, not in the flat dye. He said the splitting can't occur inside the extrusion head dye. That's where he says the cutting can't occur. And then he says, since for the accused product, it is undisputed that it is, quote, cut in a separate flat dye tool. He's recognizing that the cutting, the splitting isn't happening until you actually get into the dye. And what that means is that you never have an extruded parison. No, I don't follow that. It seems to me that your problem is, and you've heard me say it, is that the district court was not throwing Oswald under the bus at all. He was saying, we're gonna take as a given that your accused device has an extruded plastic parison and it's cut in this separate structure that's attached to the bottom of the extrusion head. And that's where it's cut. And that for that reason, there's no infringement. So let me address this question and you asked it earlier, Judge Clevenger, about the undisputed language. This is also in the same passage at appendix page 20. And you're certainly correct. I mean, it's here in black and white. He says, it is undisputed that the extruded plastic parison. And what Plastic Omnium has said here today and then over and over and over and over in their brief is that Judge Stark concluded that, in fact, it was undisputed that there's an extruded plastic parison. He cannot have included that, have concluded that. Now, first of all, this is why it was so important. This is why it's where I began that what he's quoting there is Plastic Omnium's own language. He was accepting a concession from Plastic Omnium that sits in the middle of that quote. But he didn't think that actually it's undisputed that there's an extruded plastic parison. How do we know that? Because he says it on page 19. On page 19 at the beginning of this section, Judge Stark is absolutely clear that the parties do have a dispute about whether there's an extruded plastic parison. That's the heart of the dispute. And his conclusion is that, as a matter of law, there is not one here. As a matter of undisputed- I wanted to give you a full background because I've got 236 because I got the unredacted. This setting in which he's talking about this, what the concession that's being given is this language, as explained by Oswald, okay? A multilayered parison is first extruded through Donji's Circular Extrusion Die, right? To form the six-layered parison. The die that forms the parison is terminated by a spiral mandrel. The mandrel is the portion of die that defines it. The extruded plastic parison is then cut in the flat-die tool. That language is what the District Court is accepting as true. Right. So if you go back and you say, what do you need to have infringement? You have to have an extruded parison, got it. Oswald says you got it. Then what you have to do is you have to cut it, right? That's all the patent requires, is create the extruded parison and cut it. Dr. Oswald is saying it's cut. It's cut inside the flat-die. It's not cut in the open air. Patent doesn't show any particular way of cutting, but that is accepted. The District Court says this is fine. I buy that entire argument. There is an extruded parison, requirement number one, and it's cut, requirement number two. The only problem is, from the point of view of an infringement, is the District Court says the Donji's cutting it like inside a house, inside a structure. They're not cutting it simply as it drips out as an extruded parison. So I can't see any way, no matter how hard I sort of try to talk around, unless I'm going to say the claim requires, requires the die that creates the extruded parison to be mounted at the bottom. If I buy the mounted, then I tell the other side to sit down. But I can't see that. So let me try and persuade the panel of the mounted on point, but then there's a second answer. But you know, when the judge asked you clearly, why does it make any difference where the cutting is in the housing or not? You said there are two reasons, Your Honor. It wasn't you, it was your colleague. The first reason is it's not mounted, she said. And then the next thing she said is the reason why is the cutting can't take place in the extrusion head die equipment. Those were the two, you know that. Those are the two answers. I can read them to you because I've got the transcript here. You know that I'm telling you the truth. Those are the two answers. Nothing about cutting outside. So the district judge didn't buy the argument that mounted is the answer. And the district court recognized already that you can't cut something before it's created. So I can't find a rationale with all due respect to support the judgment. So respectfully, Your Honor, I think that interpreting Judge Stark's order that way is uncharitable to the district court. I think that Judge Stark was not saying, as you would have to conclude that he was saying to reach that result, that he made up an extra claim limitation about cutting inside. I have the greatest respect for this judge. I simply thought maybe he got confused about what is doing the cutting and where the paracin is created. And Judge Clevenger, I agree with what you said earlier. He was not confused at all. When you read that transcript, he absolutely understood how this functions. So let me point to the other place that- And he was given two reasons by you as to how and why he could make the difference and he didn't accept either one. So at page 948 of the appendix, which is another part of the claim construction order, he explains exactly why he thought that you can't split the molten plastic inside of the extrusion header that died. And this is exactly the same point I've been making- Wait, wait, wait, stop. The liquid inside, no one's arguing that there is a paracin that's created inside the extrusion head before it passes through a die. That's molten plastic, right? And everyone, there's a concession that the accused device creates a paracin that emits from the bottom of its co-extrusion head. That's a conceded fact. But it is not passed through a die and that's exactly the point it was- So then the question is, how did your paracin get created before it got to the flat die? Right, it flows- How? Because there's a fact finding that you got one. You've got an extruded paracin that goes into your flat die. How did it get there? So Judge Clevenger, we may just have to agree to disagree about this. I do not believe that there is a fact finding that there is an extruded paracin here where the defined term in the patent is that in order to have an extruded paracin, it has to have passed through a die. And nothing about- Well, then there's a fact question. Again, you're gonna throw Oswald under the bus. What I just read you from the portion of the summary judgment briefs that you chose conveniently not to give us, I understand what the district court was buying onto for the concession. He was saying there, as he says, there is, it's undisputed, there is an extruded plastic paracin has to come out of your co-extrusion die. It didn't get created in thin air. And it slides into your separately mounted flat die. Dr. Oswald- Now, if you and I are arguing as to whether or not this exists, then how could there have been a summary judgment? Dr. Oswald threw himself under the bus. Dr. Oswald took a position that is flatly contrary to what the claims themselves require. He equated the die- And your product literature, your manual, not the product literature, 45 times says that you create a paracin. The patents are clear over- Is that why, I mean, why would one of our interns when they're reading your manual think that you don't create a paracin? Judge Clevenger, what a manual says or what terminology it uses doesn't tell us what these patents mean. The patents tell us what the patents mean. And the patents are clear that the extrusion head and the die are two separate things. They use the word die over and over and over and over and over. And this court presumes that when a patent uses different words, they mean different things. And then both patents describe the invention itself, not an embodiment, the according to the invention that the die is mounted on the head. And Judge Stark understood that he actually, and this is at 948 of the appendix, the court, this is quoting from the claim construction order, the court further agrees with Donghi that plastic is incorrect in its contention that the die can be located- Where are we on 948? One, two, three, four, five, six lines from the bottom. Well, that goes to the question of whether it's located in, above, or at the bottom. The whole debate about the location below, having read as much as I could get, was the question of whether or not this die, whether it could exist upstream somewhere in the extrusion head or whether it had to be at the bottom. And that's the answer to your question about the spiral mandrel, Judge Clevenger. To conclude that the spiral mandrel located up inside- Wait, wait, wait, that's where we don't know where it's located, that part of the problem. Oswald says at one point it's the bottom. And he shows that- He's sworn testimony, sir. He shows that it is, he does not say it is mounted at the bottom. It is a tube, and they show this in the diagram that they themselves constructed for the appellate briefing that the spiral mandrel is the interior layer. There is no factual dispute about that. It is absolutely clear that the spiral mandrel is simply a pillar, a column, that runs down the length of the die. And Judge Stark concluded, you said that he didn't address this anywhere, this is exactly what he's saying at Appendix 946, where he specifically concludes that plastic omnium is wrong, that the die can be located anywhere. This goes to exactly the same point that I've been trying to emphasize, that Dr. Oswald wanted to have it both ways, that he specifically says that at Appendix 240 and Appendix 249, he treats the head and the die as the same thing. And he needs to do that because he needs the plastic to have passed through a die before it's cut. And though one critical thing that Judge Stark concludes at Appendix 20 is that the opposite happens, is that you cut first and get shaped in a die only after. And that was his basis for concluding that there simply is not infringement as of... Cut first and shape in the die? Well, that's what a die does, is it shapes the plastic. You're talking about your flat die? That's what any die does. When you say that, you're talking about... Yes, correct, Your Honor. And your flat die cuts and then shapes? Yes, Your Honor. And shapes it into the two pieces. Exactly, right, and that has the... And they have blades that cut and shape into two pieces. Only after an apparison has been extruded by passing it through a die. Again, that's the same point about whether the head and the die can be the same thing. And Judge Stark agreed with us that they can't be the same thing, and the patents themselves are clear that they can't be the same thing. And did the patentee act as its own lexicographer in the definition of the term extruded apparison? Absolutely, Your Honor. And if I didn't make that point clearly enough... I don't think that point's been made, that it's actually the patentee that defined the term extruded apparison. That's Appendix 77, Column 2, Line 35. And it does make reference as to some formal order that has to be followed. And we get the same thing out of Claim 1 of the 812, where it has the steps in a method, right? And it has to be an extruded past tense, an extruded parison that's being cut, right? You have to have the thing extruded through a die in order to satisfy that definition. My understanding is that, well, certain terms may have a certain meaning in the art or in the field that the patent applies to, where a patentee acts as its own lexicographer, then that definition is preeminent. That's exactly right, Judge Reyna. And we think that that definition, in addition to the description of the invention as a whole, which American pile driving in other cases have made very clear is critical to understanding what the claims mean, is controlling here. The Court's been very indulgent, and I see I'm well over my time. I do want to make sure that if the Court has any questions about the other set of claim terms or about the doctrine of equivalence, that I'm able to answer those. I'll take it on the briefs. Do you want to go into that? No, I'm fine. Okay, I think now that this is helpful to us, we conduct our debate with you rather than in the back room. Thank you very much, Your Honor. Thank you. Mr. Hatch. Let's make that five minutes. Thank you, Your Honors. If I may, I would start with the issue of, or the argument that the die must be a separate component for the Parison claims patents and then turn to the preassembled structure argument after that. You're talking about the die that creates the Parison? That's correct. In fact, where I'd like to start on that point is the District Court Summary Judgment Order again. And I'd like to point the Court to a passage from that order on Appendix 20, page 14 of the order, and I will quote from it. Quote, the claim construction makes it clear that whether the extrusion equipment consists of a single combined extrusion head with a die or a more complex extrusion head with a separate attached die, and it goes on. The District Court heard this argument, it contemplated this argument that the die must be separate and attached to the extrusion head, and it rejected it. Dr. Oswald was not pointing to the extrusion head in general in saying that's a die. The point is that the extrusion head has an integral die at its outlet that when all of this plastic that's swirling around in it and ultimately gets combined, falls through the outlet in the form of a Parison, an extruded Parison, that's what the court recognized, that's what the court saw as undisputed, and in fact. Is the plastic at that time, is it still in the molten state? Your Honor, that is not a fact that anyone has touched conclusively. It's probably hot, but I think there are viewpoints on that that differ. In an easy way to look at that is to say that it's either liquid or solid. I mean. Or it could be some viscoelastic. Whether it's molten, I mean, is it liquid or solid? I mean, it's not, no, it's not solid. Right. It's in some state of liquidity. Scissors are not being used to cut it. It's probably in some sort of viscoelastic form that needs to fall over that cutter to be split. It is a Parison that has a tubular form. It's not solid. I don't think so, I would say. I don't think. Well, there isn't a requirement. No, there's not. I just, I hate to state something as a. What you know is the stuff that's introduced into the original device, that is probably in liquid form. That's molten. Somewhere between a liquid and a solid, and we do know that. It had to flow. Right. And I didn't see any debate. Gravity seems to be what's doing it, right? Right. It had to flow. We do know that at the end of that flat die tool, there is another set of die, these flaps that can. We're referring to the Donghi device, right? Donghi flat die tool, yes. So let me go back to the definition in your patent. You acted as a lexiographer, and at the end of that you say, according to the invention, the Parison has a closed cross section, preferably this cross section is circular or elliptical. That has shape and form. That's not molten, or it's not liquid. Oh, it's in a molten liquid form. Yes, it does not have to be solid. The definition is what the court has adopted as the extruded Parison definition. I'm reading your definition. Yes, yes. I'm saying that definition was expressly adopted by the court as the extruded Parison definition, from which the court undisputedly found that there was an extruded Parison. There can be an extruded Parison in a non-solid, total solid form. It can be in some form other than a solid form. Like a balloon. It's flexible. Right. Okay, see if you can wrap it up. Sure. So with that, I'll move on to the pre-assembled structure limitation. The district court- He didn't talk about that, right? He did not. So you're rebutting something he didn't talk about? That's true. I can sit down, and we can conclude our argument. Isn't the game here? I mean, do you have an argument that he is, Mr. Shumsey's done a very good job for his client, and he said, well, that Oswald's not worth the paper it's written on. He's asking us to discount, or to say that Oswald has conceded that you only have one structure. You're referring to- You don't have a die. You don't have a die that creates a Parison. He has not conceded that. Well, you heard what he said. He said, because at some stage in Oswald's testimony, he's talking colloquially, that would be your argument, talking about the co-extrusion hit. So Dr. Oswald has opined in his expert report in the materials that were before the court that the Dong-He co-extrusion die does have a die at its outlet that creates a Parison. There is a doctrine of equivalence issue that was also before the district court. Dr. Oswald took the argument that was being made at the time that the co-extrusion head did not have a die. And under that argument, then addressed under the doctrine of equivalence, the infringement issue. So that is not accurate that he has pointed to the extrusion head and opined that it does not contain a die. That was just part of his opinion for the doctrine of equivalence in the event that that ended up to be a fact. But it's not. With that, your honors, we would conclude and ask the court to modify the claim constructions and remand them to the district court for further discussion. You're not asking us to modify the claim construction. You're saying, believing that the district court added, well, he added something to the claim construction in the summary judgment by saying that the cutting has to occur in the plain air instead of in the housing. That's correct. Thank you. Thank you. Thank you both. The argument was very helpful to us.